**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

UNITED STATES OF AMERICA

        v.

GREGORY DONALD

Case No. 20-CR-832

Judge John Robert Blakey

**MEMORANDUM OPINION AND ORDER**

On November 30, 2020, the grand jury indicted Defendant Gregory Donald for unlawful possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1). *See* [1], [2]. On April 22, 2021, Defendant moved to suppress certain evidence, including the gun seized from him at the time of the arrest that lead to the indictment. *See* [27]. This Court held an evidentiary hearing on Defendant's motion on February 15, 2022 and then denied the motion from the bench and via minute entry on June 15, 2022, indicating that a written ruling would follow. *See* [49].

This ruling constitutes the Court's findings of fact and conclusions of law.

## I.    Findings of Fact

The parties agree that, on August 28, 2020, at about 12:15 p.m., Chicago Police Officers observed Gregory Donald standing on the sidewalk in front of a building located near 79th Street and Marshfield Avenue in Chicago, next to a group of individuals playing a game of dice. [47] at 2–3. They also agree that Officers arrested Defendant in the vestibule of the building approximately twenty-five minutes later, at

1

12:40 p.m.; at that time, they recovered a loaded Glock 29, 10 mm semiautomatic pistol bearing serial number BKTF841 from Defendant's right pants leg. *Id.* at 2, 4. Finally, they agree that Officers did not issue a citation to Defendant for playing dice. *Id.* at 3.

But the exhibits and testimony admitted at the February 15 evidentiary hearing paint a more complete picture of what went down at the time of Defendant's arrest. Consistent with the sworn testimony, the officers' body worn camera footage and footage from a Police Observation Device (POD) aimed at the scene—which the parties agree is admissible, [47] at 5—demonstrates that Defendant was pacing and glancing furtively up and down the block and around the corner while repeatedly handling and adjusting a dark L-shaped bulge at his waist. Based upon the entire record, this Court finds that officers possessed more than sufficient facts to believe (and evidence confirms their belief to be true) that Donald was, in fact, engaged in active counter-surveillance (while potentially armed), as he worked as a lookout/security guard for what was clearly an illegal dice game.[1]

Initially, the officers who arrested Defendant—Officer Matthew Carney and Officer Jose Gutierrez—both testified at the hearing, and this Court finds their testimony credible. Specifically, the officers confirmed that, on August 28, 2020, they

---

[1] Chicago Municipal Code § 8-12-010 prohibits gambling and provides: "No person shall play or engage in faro, roulette, or gambling for money or other valuable thing, or in any other device or game of chance, hazard, or skill, either as bookmaker, dealer, keeper, player, or otherwise, for the purpose of gaming or gambling for money or other valuable thing." The obvious violation of this ordinance provides probable cause for Defendant's initial detention and subsequent arrest. *E.g., Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Thomas v. City of Peoria*, 580 F.3d 633, 638 (7th Cir. 2009); *Murphy v. Salgado*, No. 13 C 4566, 2014 WL 114266, at *1 (N.D. Ill. Jan. 13, 2014).

were assigned to the 6th District in Chicago's Gresham neighborhood, working the day shift, and monitoring POD cameras from the 6th District's tactical office. Around noon, Officer Gutierrez was specifically monitoring the activity of a person known to deal narcotics in the area; the officers had observed the person at a gas station at 79th and Ashland and then tracked him using POD cameras, switching over to cameras at 79th and Marshfield to continue their observation, and pointing the camera at a building located at 7851 South Marshfield. Both officers testified that the area they were monitoring constitutes a high crime area, known for significant narcotics activity and gun violence, including shootings and murders.

Officer Carney testified that, at around 12:17, using a POD, he and his partner observed several individuals illegally gambling on the sidewalk outside the building on 79th and Marshfield, and then observed the Defendant, who was wearing a white t-shirt and black pants, repeatedly grab and adjust an object protruding from his right hip. Carney also testified that Defendant appeared at times to be holding U.S. currency in his right hand. He testified that, at one point, Defendant bent over and grabbed the object at his hip, which allowed Carney to better observe that the dark object, tucked inside Defendant's underwear, was L-shaped. Officer Gutierrez also testified that he observed the Defendant, with a bulge protruding on his right hip and his t-shirt sitting on top of the bulge, favoring his right side as he walked and bent over, indicating to the officer, based upon his training and experience, that the object at Defendant's hip was a handgun. Officer Gutierrez testified that, at times, he also saw a cell phone in the

Defendant's left hand.

The POD footage confirms the officers' account: several individuals visibly shoot dice in exchange for money, plainly gambling in violation of the Chicago Municipal Code, while Defendant stands lookout, glancing furtively and repeatedly up and down the block and around the corner, all while grabbing at the bulge tucked into his waistband.

Based upon these observations, Officers Carney and Gutierrez drove to the area covered in the POD, which was about a mile away from the tactical office, to further investigate the activities of Defendant and the men engaged in illegal gambling on the sidewalk. When the officers (dressed in full police uniform), pulled up at approximately 12:35 p.m., the Defendant immediately fled from the police into the building. Officer Carney jumped out of the car and gave chase, caught the Defendant in the vestibule, and immediately placed him in handcuffs to conduct a protective pat down, at which time officers recovered a gun from Defendant's right pants leg. Officers then ran Defendant's name through the computer in their car and learned that he did not possess a valid FOID card or Concealed Carry License, making possession of the gun an arrestable offense. At that point, the officers arrested Defendant for the firearm offense.

On cross examination, Officer Carney admitted that before officers arrested the Defendant, Carney had never seen him before, had never seen him holding a gun, had never seen him playing dice himself or engaging in any other illegal activity, and did

4

not recognize him to be a member of a gang.  Carney testified, however, that the Defendant appeared to be on high alert during the minutes captured on the video, standing by the door, and looking back and forth when a car drove by, indicating, based upon Carney's experience and training, that Defendant was serving as a lookout for the individuals engaged in the illegal dice game on the sidewalk.  He also testified that, after catching Defendant, he immediately conducted a protective pat down because of the prior observations and Defendant's attempt to flee from the officers and potentially conceal something.

Officer Gutierrez similarly testified on cross-examination that he had never encountered the Defendant before this incident and did not know him to be a member of any street gang.  Gutierrez also testified, however, that, in his experience, when individuals are engaged in an illegal dice game, they typically have a person serving as a lookout, and he believed, based upon his observations, the Defendant served this purpose on August 28, 2020.

## II.    Conclusions of Law

The Defendant argues that the officers lacked a reasonable suspicion to detain him in the first instance and had no basis to conduct a pat down search of his person. As a result, he argues, this Court should suppress the gun discovered incident to that search.  Specifically, Defendant argues that the investigatory stop was not justified because the officers did not know him, knew nothing about him, and did not observe him do anything illegal; they acted, he argues, solely on a hunch, which remains

5

insufficient to justify the stop.[2]  The evidence, however, undermines his arguments.

Officers may "stop and detain briefly a person for investigative purposes when the officer has a reasonable suspicion, supported by articulable facts, that criminal activity is afoot." *United States v. Pace*, 48 F.4th 741, 749 (7th Cir. 2022) (citing *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)).  Reasonable suspicion exists "when an officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* (quoting *United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020)).  Although reasonable suspicion "requires something less than what is necessary to show probable cause, it requires more than a mere 'hunch.'" *Id.* (quoting *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999)).  In evaluating the reasonableness of the officers' conduct, this Court must consider "the totality of circumstances and 'must not be overly focused on any one factor.'"  *United States v. Richmond*, 924 F.3d 404, 411 (7th Cir. 2019) (quoting *United States v. Swift*, 220 F.3d 502, 506 (7th Cir. 2000)).[3]

---

[2] At the hearing, defense counsel also suggested that the officers, having chased the Defendant into the vestibule of an apartment building, may have needed a warrant; but, after having been given an opportunity to file a brief on that separate issue, counsel declined and thus abandoned that argument.

[3] *See also United States v. Gary*, 790 F.3d 704, 707–708 (7th Cir. 2015) (Officers possessed authority to act even though there "could have been innocent explanations" for the targeted activity, so long as "the inference of the criminal activity was reasonable.") (citing *United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003)).  The Court's analysis must also examine facts "from the perspective of what" the officers knew collectively "at the time" of the search or seizure, *Fox v. Hayes*, 600 F.3d 819, 832 (7th Cir. 2010), rather than engaging in some "post hoc determination," *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006); *United States v. Howard*, 883 F.3d 703, 707 (7th Cir. 2018) (holding that, under the "collective knowledge" doctrine, the police officers who actually make an arrest or search "need not personally know all the facts that constitute probable cause if they reasonably are acting at the direction of another officer or police agency.").  This Court also must consider the facts from "the standpoint of an objectively reasonable police officer," although viewed "through the prism" of the officers' "training and experience."

In seeking to suppress the gun recovered from his pants, Defendant argues that the officers were wrong to suspect that the bulge at his waist was a gun, when it could just as easily have been an insulin pump or a wallet. But the POD video undermines his argument as to the wallet: Defendant's wallet, hanging from a chain at his waistband, remained visibly displayed throughout the video footage, separate from the bulge. And although an insulin pump, if tucked into a waistband, might also create a bulge, the shape and placement of the bulge at Defendant's waist, the way he favored his right side because of the bulge, and the way he repeatedly touched and adjusted the bulge, told the officers, based upon their other observations and their experience and training, that this bulge was a gun. Defendant's focus exclusively on the list of objects that might reasonably be expected to produce a bulge ignores the context of the officers' observations; considering the totality of the circumstances, as this Court must, their suspicions were reasonable and supported by articulable facts, as precedent demonstrates.

In *United States v. Richmond*, officers were surveilling an area known to be a high crime area when they observed the defendant walking toward their squad car and noticed a bulge in his front pocket; when Richmond saw the officers, he changed direction and walked up the stairs to a duplex, where he appeared to place a dark object between the duplex's screen door and front door. 924 F.3d at 408–09. The officers made a U-turn

---

*United States v. Burnside*, 588 F.3d 511, 518 (7th Cir. 2009). As always, this Court's inquiry remains an objective one; the subjective motivations of the officers cannot invalidate a search or seizure, if it is objectively reasonable based upon what the officers observed. *See Carmichael v. Vill. of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010).

and followed Richmond, then exited their squad car, climbed the steps to the duplex's front porch, and began questioning him. *Id.* When the officers retrieved the object from between the doors and discovered it was a gun, they asked Richmond if he was a convicted felon; when he said he was, the officers arrested him. *Id.* at 409. Richmond moved to suppress the gun, the district court denied the motion, and the Seventh Circuit affirmed, finding that the following facts "created a suspicion that Richmond was illegally carrying a gun or was otherwise engaged in unlawful activity: (1) Richmond was walking down the street near midnight in a neighborhood plagued by drug trafficking and gun violence; (2) there was a significant bulge in Richmond's front T-shirt pocket as he walked down the street; (3) in the officers' over 25 combined years' of police training and experiences, a protrusion like this was more often than not a gun; and (4) after the officers passed Richmond in their marked squad car, Richmond quickened his pace, changed his direction, cut across a property, and hid what they suspected was a gun between the screen door and front door." *Id.* at 411.

Although Defendant Donald's arrest occurred closer to noon than midnight, the circumstances in this case bear remarkable similarity to those described in *Richmond*. As in *Richmond*, Officers Carney and Gutierrez were surveilling an area known for high narcotics trafficking and gun violence when they observed Defendant standing guard on the sidewalk as several individuals illegally played dice; he had an L-shaped bulge on the right side of his pants waistband, which he favored and adjusted in a manner that

8

lead the officers to believe, based upon their years of experience,[4] constituted a concealed gun; and when they pulled up, they observed him abruptly turn and flee into the building. As in *Richmond*, the officers' knowledge that the surveillance area constituted an area known for gun violence, coupled with their specific observations of the Defendant, who appeared to be acting as a lookout for illegal gaming activity, while favoring his left side, with an L-shaped bulge tucked into his waistband, which he adjusted several times, constitutes specific articulable facts that supply the reasonable suspicion to justify the officers' decision to "stop" the Defendant.

*United States v. Wilson* is also instructive. Wilson was hanging out in Douglas Park with a group; as police approached, they observed Wilson grab a bulge in the front pocket of his shorts, turn away from them, and sit down on a ledge facing away from them and the group; the police asked him to stand; he did, but sprinted away; one of the officers chased Wilson and tackled him; while on the ground, Wilson told the officer he had a gun and the officer found a loaded revolver. 963 F.3d 701, 702 (7th Cir. 2020). Wilson moved to suppress the gun, arguing that the officers lacked reasonable suspicion to seize him when they approached and asked him to stand up; the district court denied the motion, and the Seventh Circuit affirmed, finding that the officers' knowledge of the bulge, coupled with Wilson's evasive behavior (grabbing the bulge, turning away from the officers' view) and their knowledge that Wilson was hanging out in a high crime area

---

[4] Carney and Gutierrez both testified that they had been police officers for eight years, bringing their total combined experience to 16 years.

9

likely supported reasonable suspicion; to the extent there was any doubt, the court held, "Wilson's unprovoked, headlong flight from police in a high-crime area put any lingering doubt to rest." *Wilson*, 963 F.3d at 703. Like Wilson, Defendant here unquestionably took concrete evasive action. Considering the totality of the circumstances—that officers surveilling a known narcotics trafficker on a corner known to be a high crime area, observed Defendant, ostensibly standing guard over an illegal dice game with an L-shaped bulge in his waistband and money in his hand, observed him favoring his right side and adjusting the bulge, which, in their experience made them think the bulge was a gun, coupled with his quick exit into the building just as uniformed police pulled up— constitutes reasonable suspicion that Donald was engaged in criminal activity.

As the Supreme Court held in *Illinois v. Wardlow*, 528 U.S. 119, 124–25 (2000), an individual's presence in an area of heavy narcotics trafficking, coupled with "unprovoked flight upon noticing the police," supports reasonable suspicion sufficient to justify an investigative stop. And "flight" encompasses more than a headlong sprint in the opposite direction. In *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010), the Seventh Circuit held that the defendant's slow retreat as officers approached, coupled with his presence in a high-crime area and hand movements patting his front pocket, supported the officers' decision to conduct an investigative stop. So too here. The POD footage shows that, as uniformed officers arrive at the scene, Defendant sees the squad cars, and, having stood outside on the corner for twenty minutes, suddenly darts into the building. Given the totality of the circumstances, the officer's suspicion

10

that Donald illegally concealed a gun at his waistband—on top of their personal observations of the illegal dice game for which Defendant stood guard— unquestionably justified their detention and seizure of Defendant on August 28, 2020, as well as their protective pat down of his person conducted incident to that detention and seizure.

## III. Conclusion

Consistent with the above findings of fact and conclusions of law, this Court denied Defendant's motion to suppress [27] via its prior ruling [49] (oral ruling made on June 15, 2022 and reflected in the minute order entered that same date).

Date: April 19, 2023

ENTERED:

John Robert Blakey
United States District Judge

11